IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL SNOW,                    )        CASE NO. 5:14CV1861
                                 )
                Plaintiff,       )
                                 )
        v.                       )
                                 )        MAGISTRATE JUDGE
                                 )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL           )
SECURITY ADMINISTRATION,         )
                                 )        **MEMORANDUM OPINION & ORDER**
                Defendant.       )


Plaintiff Michael Snow ("Snow") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 17.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.


**I. Procedural History**

Snow filed an application for DIB and SSI on May 2, 2012, alleging a disability onset

date of May 1, 2012.  Tr. 13, 184, 188.  He alleged disability based on the following: "spinal

surgery, bad back, hard time moving around," and "can't read or write."  Tr. 215.  After denials

by the state agency initially (Tr. 108, 109) and on reconsideration (Tr. 134, 135), Snow requested

an administrative hearing.  Tr. 157.  A hearing was held before Administrative Law Judge

("ALJ") Yelanda Collins on October 31, 2013.  Tr. 41-83.  In her November 27, 2013, decision

(Tr. 13-34), the ALJ determined that there were jobs that existed in significant numbers in the

national economy that Snow could perform, i.e., he was not disabled.  Tr. 32.  Snow requested

review of the ALJ's decision by the Appeals Council (Tr. 9) and, on February 26, 2014, the

Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 4-6.

## II. Evidence

### A.  Personal and Vocational Evidence

Snow was born in 1967 and was 43 years old on the date his application was filed.  Tr.

184.  He attended high school up to tenth grade.  Tr. 216.  He previously worked in construction

from 1983 until 2010.  Tr. 216.

### B.  Relevant Medical Evidence

On May 9, 2010, Snow presented to the emergency department for a three-day history of

back pain that came upon him suddenly after carrying ladders and awnings up ladders at work.

Tr. 314.  Snow reported that, as the work day went on, he had significant low back pain that was

10/10, continuous, and worsened by movement.  Tr. 314.  The pain radiated down both his legs

but more on his left leg. Tr. 314.  Upon examination, the attending physician, Robert W.

Faulkner, M.D., found that Snow's heartrate was 125.  Tr. 314.  He had paraspinal tenderness as

well as mild spinal tenderness and a positive straight leg raise test past 10 degrees.[1]  Tr. 314.  His

extremity and neurological examinations were normal and he had full strength in his bilateral

arms and legs.  Tr. 314-315.  Dr. Faulkner prescribed morphine, Norflex, and Toradol for his

pain, which helped, and ordered an MRI.  Tr. 315.

The MRI revealed a lumbar epidural abscess that required emergency lumbar

decompression.  Tr. 316, 332, 458-459.  Snow's spinal abscess had staphylococcus growing out

---

[1]  In a straight leg-raising test, the patient lies down supine, fully extends the knee, and lifts the leg.  *See* Dorland's
Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900.  Leg pain when the leg is raised 30-90 degrees (a
positive straight leg raise) indicates lumbar radiculopathy.  *Id.*

of it.  Tr. 332.  The MRI otherwise revealed well-preserved vertebral heights and disc spaces with a mild disc bulge at L5-S1.  Tr. 458-459.  A CT scan of Snow's chest showed cavitary lesions suggestive of septic emboli.  Tr. 332.  Surgery to remove the abscess was performed.  Tr. 336-337.  Post-operatively, Snow contracted fever, pneumonia, and a fungal respiratory infection.  Tr. 316, 334.  He was treated with medication and was on a ventilator.  Tr. 316, 334.  A physician opined that Snow's respiratory failure complication was due to sepsis likely triggered by substance abuse; Snow had a history of IV drug abuse using heroin and OxyContin.  Tr. 316, 334, 345.  Snow was discharged from the hospital on June 2, 2010.  Tr. 316.

On July 7, 2011, Snow saw William Gardner, M.D., at the Open M Free Clinic for hypertension and chronic back problems with a history of spinal abscess in 2010.  Tr. 510.  Dr. Gardner prescribed Adderall and Tramadol and a follow up appointment in three months.  Tr. 510.  At his October 2011 visit Snow was also prescribed Gabapentin.  Tr. 508.  During a February 21, 2012, appointment, Snow stated he had no complaints.  Tr. 504, 505.  His prescriptions were refilled.  Tr. 505.  On May 15, 2012, Snow saw Dr. Gardner for flu and medication refills.  Tr. 502.  He indicated that he was "doing well healthwise except for chronic issues."  Tr. 502.  His medications were refilled.  Tr. 502.

Snow thereafter generally visited the Open M Free Clinic for medication refills of his Tramadol and Adderall.  *See, e.g*., Tr. 496 (medication refill sheet).  On November 15, 2012, a registered nurse indicated on a treatment note for a visit for a toothache that Snow reported that he "feels good."  Tr. 497.

On July 25, 2012, an imaging study of Snow's lumbar spine was normal apart from facet joint disease at L4-L5 and L5-S1.  Tr. 484.

### C.  Functional Evidence

When Snow was 13, his school records indicate that his reading skills were at a grade 4.4 level, his spelling skills were at a grade 3.7 level, and his arithmetic was at a grade 3.4 level.  Tr. 251.

On May 18, 2012, the social security administration representative contacted Snow in connection with his application.  Tr. 87.  Snow stated that he "can read some, but not well" and "can write, but has problems spelling."  Tr. 87.

On May 30, 2012, Snow completed a "Function Report-Adult."  Tr. 228-235.  He indicated that he sometimes lived with family, friends, or on the street.  Tr. 228.  His daily activities included walking to people's houses to visit family and friends.  Tr. 229.  He indicated he had no problems with his personal care but that, when he lived on the streets, family and friends had to remind him to perform personal care.  Tr. 229-230.  He prepared meals daily or three times per day and his habits had not changed since his conditions began.  Tr. 230.  When he could not afford food he sometimes ate with family and friends.  Tr. 230.  He could perform "all" chores but it "just takes time to with my back."  Tr. 230.  He could walk, go out alone, and shop in stores for food.  Tr. 231.  He could count change and handle a savings account, checkbook or money order, but he had no bills, checking account, or savings account.  Tr. 231.  His hobby was watching TV and he talked every day with friends and family.  Tr. 232.  He experienced pain with lifting, squatting, bending, standing, kneeling, climbing stairs, walking and sitting.  Tr. 233.  He could walk one block, then needed to rest for 10-15 minutes before resuming.  Tr. 233.  He followed written instructions "not good" but spoken instructions "perty [sic] good" and had no problem getting along with others.  Tr. 233-234.

### D.  Medical Opinion Evidence

#### 1.  Dr. Chaffee's Opinion

On February 21, 2013, Roger Chaffee, M.D., from the Open M Free Clinic, completed a "Lumbar Spine Medical Source Statement" form and a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form.  Tr. 523-534.  In his Lumbar Spine Medical Source Statement, Dr. Chaffee indicated that Snow was treated every three months beginning in December 2010 for chronic low back sciatic pain, restless leg syndrome, hypertension, and ADHD (Attention Deficit Hyperactivity Disorder).  Tr. 523.  The form asks for a prognosis and Dr. Chaffee wrote, "live long."  Tr. 523.  As clinical findings, Dr. Chaffee identified a limited range of motion, positive straight leg raises, left leg pain, and a history of back surgery/epidural abscess in 2010.  Tr. 523.  He also noted objective signs of tenderness, muscle spasms, muscle weakness, motor loss, and impaired sleep.  Tr. 524.  He listed Snow's symptoms as sharp aching pain, continuous with movement, at a pain level of 8/10 without medication.  Tr. 523.  Dr. Chaffee opined that Snow, if placed in a competitive work situation, could walk for 2 blocks, sit for 30 minutes at a time and stand for 30 minutes at a time.  Tr. 524-525.  He found that Snow could either sit or stand/walk for less than 2 hours apiece in an 8-hour work day, and would need to shift positions at will and walk for 8 minutes every 20 minutes.  Tr. 525.  He commented that Snow would require unscheduled breaks 2 to 3 times during the day for 20 to 30 minutes but would not require the use of an assistive device, such as a cane.  Tr. 525.

Dr. Chaffee opined that Snow can occasionally lift and carry less than 10 pounds, rarely twist and stoop, never crouch/squat, and can occasionally climb stairs and ladders.  Tr. 526.  He indicated that Snow would be off task 20% of the time due to ADHD but was capable of moderate stress—normal work.  Tr. 526.  Snow would have good and bad days and would be absent from work about three days per month.  Tr. 526.

In his Medical Source Statement of Ability to Do Work-Related Activities form, Dr. Chaffee's opinion was consistent with his Medical Source Statement opinion except that he indicated that Snow "sometimes" needed a cane to walk and that the use of a cane was "medically necessary"; he also stated that Snow could walk a half mile without the use of a cane. Tr. 530.  Dr. Chaffee indicated that Snow could walk for two hours without interruption at one time and that he could never climb ladders or scaffolds and could occasionally stoop, kneel and crouch.  Tr. 530, 532.

### 2.  Consultative Examiners

**Physical**: On July 25, 2012, Snow saw Ryan Squier, M.D., for a consultative examination.  Tr. 480-483.  Snow's chief complaint was low back pain that began with his work-related injury in 2010.  Tr. 480.  He also reported that he is unable to read or write.  Tr. 480.  He has a history of illicit IV drug use but no longer uses drugs.  Tr. 481.  Upon examination, Dr. Squier noted that Snow appeared in no acute distress, had a normal gait, and did not use an assistive device to ambulate.  Tr. 481.  He was pleasant and conversational.  Tr. 481.  He had "slight pain" in his lower lumbar and sacral spine and pain to palpation of his lumbosacral paraspinal muscles, but was able to flex and touch his toes and he had negative straight leg raise testing.  Tr. 482.  He had a full range of motion in all joints with intact strength in his arms and legs, no muscle wasting, and full sensation apart from slight numbness in his right gluteal region and his left big toe.  Tr. 482, 485-488.  He had intact grip strength bilaterally.  Tr. 482.  He could ambulate without difficulty with normal heel and toe walking and did not have an antalgic gait. Tr. 482.  Dr. Squier opined that it was unlikely that Snow could work in an ambulatory job setting due to past unsuccessful attempts to do so that reportedly resulted in vomiting secondary

to pain.  Tr. 482.  He opined that Snow could not perform sedentary work because he would have difficulty finding work due to his low education level and inability to read and write.  Tr. 483.

**Mental**:  On June 19, 2012, Snow saw board-certified psychologist E.M. Bard, Ph.D., for a consultative examination.  Tr. 473-478.  Snow reported that he applied for disability benefits following a back injury at work and reported a history of learning disabilities, restless leg syndrome, and ADHD.  Tr. 473.  With respect to his learning disorder, Snow stated, "I can't read or write, I was in special education."  Tr. 473.  He indicated that his impairments impact his ability to work because he takes Adderall to keep focused.  Tr. 473.

Snow reported that he was "technically homeless" but sometimes stayed with his brother or sister and had recently been living in his estranged wife's van.  Tr. 473.  He dropped out of high school during tenth grade and was unable to complete his GED while he was incarcerated.  Tr. 474.  He reported that he had not used street drugs since he was 21, had never been involved in drug treatment programs, and was not currently addicted to any alcohol or drug products.  Tr. 474.  He previously worked installing siding but could not write estimates for jobs; he estimated siding costs "by eye."  Tr. 474.  He was able to complete work tasks related to siding and awning installations without difficulty and could relate to co-workers and deal with normal work pressures.  Tr. 474.  His doctor had prescribed Adderall while he was employed at the awning company and Snow reported that Adderall "really helped" him perform his work.  Tr. 474-475.  He was never involved with mental health services or inpatient treatment and did not plan to seek such services.  Tr. 475.

Snow reported that he was a "good cook" and prepared foods such as steak, salad, breakfast foods, and chili.  Tr. 475.  He indicated that he "would be able to handle normal household cleaning responsibilities 'but it hurts my back and I have to rest.'"  Tr. 475.  He has

difficulty making change and counting money and cannot write a check.  Tr. 475.  He can use a laundromat and can "handle basic yard work and simple car repair."  Tr. 475.  He learns by doing; "I can't read it in a book."  Tr. 475.  His hobby is walking; past hobbies include watching television, cooking, and spending time with his wife.  Tr. 475.  Of his siblings, he gets along best with an older brother "who is also illiterate."  Tr. 475.  He usually walks to a friend's house or his brother's house, checks to see if his brother needs anything, "hang[s] out with him or his friend or try to work on a car," checks on the status of his disability application, and occasionally helps his estranged wife with yard work.  Tr. 475.  He is independent in his grooming, dressing and mobility and is able to tell time and make appointments.  Tr. 475.  He cannot read the newspaper or follow a recipe or understand measurements.  Tr. 475.  He might be able to look up a phone number "if I knew how to spell it."  Tr. 475.  He does not know how to operate a computer and he needs help reading his mail.  Tr. 475.

Upon examination, Dr. Bard found that Snow was able to carry on basic conversation and initiate dialogue.  Tr. 475.  His speech was relevant and coherent with a substandard vocabulary.  Tr. 475.  He was cooperative and pleasant with a normal mood and affect.  Tr. 475.  Dr. Bard found Snow to be substandard in his ability to live independently in the community, articulate problem solving skills regarding the concerns that he is facing, and has no specific plans for the future.  Tr. 476.  Dr. Bard performed an "MMSE" ("Mini-Mental Status Examination") and Snow scored three standard deviations below the mean and was within the "Deficient" classification.  Tr. 476.  He made 5/5 errors counting backwards by serial sevens, could not spell the word "world" or describe a verbally presented proverb, and could not print a full sentence.  Tr. 476.  He was able to recall two out of three words after a five-minute delay, recall his social security number forward but not backward, recall two recent news events, and could copy a

geometric design.  Tr. 476.  Dr. Bard assessed Snow's intelligence in the borderline range with

an estimated IQ of 75.  Tr. 476.  He noted a near-significant discrepancy between Snow's verbal

and non-verbal reasoning with stronger performance in the non-verbal area.  Tr. 477.  Snow was

in the borderline range in verbal reasoning and the below-average range in non-verbal reasoning.

Tr. 477.  His verbal comprehension score was in the 4th percentile and his working memory was

in the 2nd percentile. Tr. 477.  His overall performance on the Wechsler Adult Intelligence Scale

(WAIS-IV) was in the sixth percentile.  Tr. 477.  Dr. Bard diagnosed Snow with a Learning

Disorder NOS and Borderline Intellectual Functioning.  Tr. 477.

Dr. Bard opined that Snow's abilities to understand, remember, and carry out instructions

appeared to be consistent with an individual performing in the borderline range of intellectual

ability.  Tr. 478.  He found that Snow appeared to be able to perform simple tasks as would be

required in a normal environment, as evidenced by his abilities to prepare meals, handle

household chores, and arrange for transportation.  Tr. 478.  Snow's abilities to respond

appropriately to supervisors and co-workers in a work setting caused Dr. Bard no concern, and

he opined that Snow would be able to respond appropriately to pressures in a work setting within

his level of competency.  Tr. 478.  Dr. Bard opined that Snow would have difficulty in a

competitive work setting dealing with other workers with more highly developed technical skills.

Tr. 478.

### 3.  State Agency Reviewers

**Physical:** On August 14, 2012, Elizabeth Das, M.D., a state agency physician, reviewed

Snow's file.  Tr. 90-91.  Regarding Snow's physical residual functional capacity ("RFC")

assessment, Dr. Das opined that Snow could perform light exertional work as defined by the

regulations, 20 C.F.R. § 404.1567(b); i.e., he can lift/carry 20 pounds occasionally and 10

pounds frequently, stand and/or walk and sit for 6 hours in an 8-hour workday; can occasionally climb ramps and stairs but never climb ladders, ropes, and scaffolds, and occasionally stoop, crouch, and crawl.  Tr. 90-91.

On December 19, 2012, state agency physician Robert Wysokinski, M.D., reviewed Snow's file and affirmed Dr. Das' RFC assessment.  Tr. 115-117.  Dr. Wysokinski further explained that his opinion was supported by Snow's normal physical examination findings following his 2010 surgery, including negative straight leg raising; normal motor strength, range of motion, gait, and the absence of an assistance device; and Snow's activities of daily living of cooking, cleaning, basic yard work, simple car repair, and his ability to groom and dress himself. Tr.  117.

**Mental**:  On July 19, 2012, state agency psychologist Tonnie Hoyle, Psy.D., reviewed Snow's file.  Tr. 88-89, 91-93.  Dr. Hoyle opined that Snow was mildly restricted in activities of daily living and maintaining social functioning and had moderate difficulties in maintaining concentration, persistence, or pace.  Tr. 89.  He had no repeated episodes of extended decompensation.  Tr. 89.  She found that, despite Snow's borderline intellectual functioning, he could remember simple one- and two-step instructions on a sustained basis.  Tr. 92.  Dr. Hoyle concluded that Snow could remember, understand, and communicate effectively to complete simple one- and two-step job tasks that are low stress.  Tr. 93.

On December 19, 2012, psychologist Aracelis Rivera, Psy.D., reviewed Snow's record and affirmed Dr. Hoyle's assessment.  Tr. 114, 117-119.

### D.  Testimonial Evidence

#### 1.  Snow's Testimony

Snow was represented by counsel and testified at the administrative hearing.  Tr. 44-75.
He testified that he lives in a house with his wife, from whom he is separated.  Tr. 44-45.  He has
been living with his wife for eight months, sleeping on the couch; prior to that he was homeless.
Tr. 45.  His wife is supporting him financially.  Tr. 45.  He has not applied for food stamps
because he does not know how and because he cannot read and write.  Tr. 45.  He recently got a
driver's license after not having had one for a year and a half because he could not afford to get
one.  Tr. 45-46.  He was able to pass the driver's test because "they have verbal recording you
put on."  Tr. 47.

Snow dropped out of high school while in the tenth grade because his dad stopped paying
the family's bills and he had to work to support his family.  Tr. 47.  He stated that he got Fs and
Cs in school and "wouldn't show up."  Tr. 47.  He was embarrassed that he was not as smart as
other kids.  Tr. 47.  He testified that he "can read a little bit.  It just—words get confused on me.
I don't understand the words when I'm reading, so like if I read something, I won't even
remember ... what I just read."  Tr. 48.  He reads newspapers but does not understand what he is
reading and asks his wife.  Tr. 49.  He looks for car parts in the newspaper; he is interested in old
cars.  Tr. 49.  He has never used a computer.  50.  He filled out his Functional Report by his own
hand and signed it, though his wife helped him.  Tr. 50-51.

Snow testified that he learned how to install vinyl siding after he left school and it is the
only job he has done since then.  Tr. 51.  He was self-employed for about ten years and also
worked for an awning company hanging awnings and putting up large tents at fairgrounds.  Tr.
51.  The heaviest he lifted was about 100-150 pounds.  Tr. 52.  He has not worked since 2010
because it hurts when he moves.  Tr. 52.  When he goes to the store with his wife he is able to go
down two aisles then has to go back to the car to sit down.  Tr. 52.  The pain is in his lower back

where he had surgery and he will also sometimes get a sharp pain down his legs.  Tr. 52.  He has to keep his left leg stiff because when the pain comes it will buckle and he will fall.  Tr. 52.

Snow stated that, after his surgery in 2010 to remove his spine abscess, he felt relief, "better than when I was" hurt.  Tr. 53.  He said that he was prevented from working again after his surgery because he has a hard time understanding people.  Tr. 54.  He also said that it hurts when he stands for a long time, and that laying down on his left side helps but he can only stay in that position for so long because his side gets numb.  Tr. 54.  He can stand for about 20 minutes and then he has to move around to take the pain away a little bit.  Tr. 54.  He can walk for less than one block before he would need to stop and rest, and his pain gets worse the farther he walks.  Tr. 55.  He can sit for 30 or 45 minutes before having to get up because he has to sit on his right side and he gets tired.  Tr. 55.  When he sits down, he puts all his pressure on his elbow and hand because he is numb.  Tr. 55.  He testified that, currently, he could probably lift and carry 15 to 20 pounds.

Mentally, Snow stated that he has problems because he cannot read and write.  Tr. 56.  He said that when he was self-employed, his siding company could have "t[aken] off and did good like the rest of everybody else did," but that he could not read or write.  Tr. 56.  As a result, he could not fill out contracts with people.  Tr. 56.  He would tell them he would take the contract home and do it on his computer, but he was "lying to them" and would have his wife do it.  Tr. 57.  People did not trust him because he could not fill out the contract in front of them.  Tr. 57.  He also had problems getting paid and would find out other construction crews were making more money because "they know what to add [] on their contract."  Tr. 57.  When he started working for a construction company he would still have to fill out paperwork, which he could do "sometimes."  Tr. 58.  The person he would turn his paperwork into would call his

12

writing sloppy and say she could not read it.  Tr. 58.  Snow stated that his spelling was

problematic and that he put capital letters where they do not belong.  Tr. 58.  He was let go from

his job after his surgery because he could no longer perform the work physically.  Tr. 59.  He and

his wife looked in the papers to find work but were unable to find anything because of his

reading and writing ability.  Tr. 59.

Snow stated that he sleeps badly because of his pain and restless leg syndrome, only

sleeping about 20 minutes every hour.  Tr. 60.  He takes at least two-to-three naps every day for

a half-hour.  Tr. 69.  He described a typical day for him: he gets up, walks outside and tries to

"stretch and do stuff" in the yard.  Tr. 61.  He lets the dogs out then brings them back in.  Tr. 61.

He makes a pot of coffee and then sits down and watches some television.  Tr. 61.  He picks up a

book and "tr[ies] to read it and understand what I'm reading."  Tr. 61.  The last book he looked

at was a book from the 1800s about how people cooked, cleaned, and remedied physical

ailments.  Tr. 61.  He stated that he was looking for a remedy for his toothache and consulted the

book to learn how people remedied toothaches from that time.  He found something about

toothaches in the book but did not "understand what they meant by it when I read it."  Tr. 62.  He

gave it to his wife to read when she got home, but his wife did not read it "because they was

talking about dipping ammonia into—a cotton in—with some ammonia and stuffing it in there.  I

was like, that don't seem to be cool."  Tr. 62.

Snow tries to help out with chores when he can.  Tr. 62.  He folds towels and, after he

wakes from sleeping on the couch, folds the covers and sheets and places them at the end of the

couch.  Tr. 62-63.  He cooks, but cannot cook big meals because he cannot stand over the top of

the stove.  Tr. 63.  He can dry a few dishes and put them away, sit down, then put more dishes

away.  Tr. 63.  His wife carries the laundry baskets downstairs and he loads the washer.  Tr. 63.

13

He stated that he has no social circle other than his wife.  Tr. 63.  He has five brothers and five sisters that he speaks to once in a while on the telephone.  Tr. 64.  He does not visit them because he does not have a car.  Tr. 64.  His sister will pick him up to attend church with her "when I can," but he has not gone in the last five months.  Tr. 64.  His hobbies include putting models of old cars and planes together and collecting flashlights. Tr. 65.

Snow testified that he is taking Adderall to stay focused, and Tramadol and Gabapentin. Tr. 66.  He does not want stronger medicine because he does not want to get addicted; "I'd rather deal with the pain a little bit than be a zombie or dead."  Tr. 67.  The Gabapentin makes him feel drunk and makes him dizzy, so he only takes it at night.  Tr. 70.  On a good day, his pain is 5/10 and on a bad day it is 8/10.  Tr. 67.  To keep the pain from getting worse, he moves in different positions, such as sitting with his hand down and putting strain on his elbow to keep the strain off his back.  Tr. 67.  He always sits with his left elbow on the arm of the chair, and when he sits in a chair with no armrest he places his hand in front of him and can only sit for a few minutes. Tr. 68.  He is unable to sit and use both his hands and, as a result, can no longer put models together.  Tr. 69.  When he can no longer sit because of the pain he lies down and uses an icepack or a heating pad.  Tr. 69.  He is also unable to stand for long before he has to move around because he feels pressure on his spine.  Tr. 70.

Snow got a cane after his surgery but did not bring it to the hearing because it is metal and he knew he would have to go through a metal detector.  Tr. 71.  It was not prescribed.  Tr. 71.  He uses it for balance because he gets a sharp pain in his left leg when walking up steps and will fall.  Tr. 71.  "Once in a while" it will happen on flat ground.  Tr. 72.  His doctor has not given him other options for treatment and just checks him and asks how he is coping.  Tr. 67.  He stated that his doctor told him that, when he had his surgery, "they didn't get all the infection

14

off" and if he moved the wrong way it would hurt his back again and the infection would return. Tr. 68.

Snow stated that he can read a couple of paragraphs in a book and then "end up going out in la-la land" and have to read it over, again and again. Tr. 72. The same thing happens when he watches television. Tr. 72. The Adderall helps him get interested in trying to learn and read, although it is still difficult for him. Tr. 73. He has problems understanding verbal instructions. Tr. 73. He has no problems getting along with other people. Tr. 75.

### 2. Vocational Expert's Testimony

Vocational Expert Barbara Ellen Burk ("VE") testified at the hearing. Tr. 75-82. The ALJ discussed with the VE Snow's past relevant work as a sider in construction and a tent erector. Tr. 75-76. The ALJ asked the VE to determine whether a hypothetical individual could perform the job Snow performed in the past if that person had the following characteristics: can perform a range of sedentary work but needs to alternate positions about every 45 minutes to an hour as needed; would be expected to remain on task; can occasionally push and pull with foot controls, climb ramps and stairs, balance, stoop, kneel, crouch and crawl; cannot climb ropes, ladders or scaffolds; cannot be exposed to unprotected heights, moving mechanical parts and cannot operate a motor vehicle; can perform simple, routine and repetitive tasks—basically unskilled work with simple decision making; cannot do fast paced work but can perform at average production rate pace or quotas. Tr. 76. The VE testified that the person could not perform Snow's past relevant work. Tr. 77.

The ALJ asked the VE if there were any jobs that the individual could perform and the VE answered that the individual could perform the job of small products assembler. Tr. 77. She

explained that small products assembler is in the DOT[2] as light work, but that there are specific worksites where it exists as unskilled sedentary, at SVP 2,[3] with a language level of first to third grade.  Tr. 77.  At the unskilled sedentary level, there are 500 Northeast Ohio jobs and 38,000 national jobs for small parts assembler.  Tr. 77.  The VE also identified work as a cashier that is light work but also exists at the sedentary level.  Tr. 77.  At the unskilled sedentary level, SVP 2, the language level is fourth to sixth grade and there are 700 Northeast Ohio jobs and 66,000 national jobs.  Tr. 77.  Lastly, the VE identified work as a telephone solicitor, which is sedentary work.  Tr. 78.  The VE stated that it is listed in the DOT at an SVP 3, but that "[r]ecent research places it at an SVP 2."  Tr. 78.  The language level is seventh to eighth grade, and it exists both as skilled and unskilled.  Tr. 78.  At the unskilled, SVP 2 level, the language level is fourth to sixth grade.  Tr. 78.  At that level, there are 5,300 Northeast Ohio jobs and 172,000 national jobs. Tr. 77-78.  The ALJ asked the VE whether there was any other position that was at the first to third grade language level at an SVP 2, and the VE answered that there were not, stating, "America has lost the unskilled sedentary base."  Tr. 79.  She explained that employers are now cross-training their employees such that an unskilled sedentary worker may also be required to perform a higher strength level occupation.  Tr. 79.

The ALJ asked the VE whether an individual could perform full time employment if the individual needed more than two breaks a day or ongoing reminders to stay on task, resulting in the individual being off task more than 20 percent of a workday or absent more than two days per month because of illness. Tr. 80.  The VE answered that such an individual could not perform work.  Tr. 80.

---

[2]  The Dictionary of Occupational Titles (DOT) is published by the Department of Labor.  *See* 20 C.F.R. § 404.1566(d)(1).

[3]  SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.  Social Security Ruling No. 00-4p, 2000 WL 1898704, at *3 (Social Sec. Admin.  Dec. 4, 2000).  Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

Next, Snow's attorney referenced the VE's observation that many employers are cross-training employees and asked the VE whether the numbers that the VE gave for the three jobs included cross-trained jobs.  Tr. 80.  The VE responded that the three jobs are not cross-trained jobs.  Tr. 80.  The attorney asked the VE whether a small products assembler requires the use of both hands while sitting, and the VE answered in the affirmative.  Tr. 80.  The attorney asked and the VE confirmed that a person sitting down who could only use one hand at a time could not perform work as a small products assembler.  Tr. 80.

Snow's attorney then asked the VE whether, with respect to the sit/stand option given by the ALJ, the individual could perform the jobs listed if that individual could not stand still for more than a short period of time before having to walk around.  Tr. 81.  The VE stated that such a limitation would preclude the jobs and would require a special accommodation.  Tr. 81.  The attorney asked the VE what kinds of cashier jobs are light work because, based on his observation, it seems that cashiers are always standing, and the VE answered that cashiers are often sitting and standing.  Tr. 81.  The attorney asked whether the job required the use of math and the VE replied that fourth to sixth grade math skills are required.  Tr. 81.  The attorney asked the VE if the small products assembler job is like a factory job, and the VE stated that it is.  Tr. 81.  The attorney asked whether this kind of unskilled factory job requires a person to be at their station working and unable to take breaks unless they have someone to fill their spot.  Tr. 82. The VE answered yes, and explained that, typically, the job would have a 15-minute break in the morning, then a lunch break, then another break in the afternoon.  Tr. 82.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

> 1.  If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  Id.

### IV. The ALJ's Decision

In her November 27, 2013, decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security
      Act through September 30, 2012.  Tr. 15.

2.    The claimant has not engaged in substantial gainful activity since May 1,
      2010, the alleged onset.  Tr. 15.

3.    The claimant has the following severe impairments: history of
      endocarditis, acute respiratory failure, and lumbar epidural abscess, status
      post ("s/p") month-long hospitalization and posterior lumbar
      decompression and evacuation of abscess; history of learning disorder;
      borderline intellectual functioning ("BIF") and history of alcohol and
      intravenous ("IV") drug abuse, in sustained full remission.  Tr. 15-16.

4.    The claimant does not have an impairment or combination of
      impairments that meets or medically equals the severity of one of the
      listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 17.

5.    The claimant has the residual functional capacity to perform sedentary
      work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he is
      further limited as follows:
            -Should be permitted to alternate every 45 to 60 minutes, though
            only as needed, but would remain present and on task at the
            workstation;
            -Can occasionally push/pull with the bilateral lower extremities,
            as in the operation of foot controls;
            -Can occasionally climb ramps and stairs, balance, stoop, kneel,
            crouch, and crawl;

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

> -Can never climb ladders, ropes, or scaffolds and should have no
> occupational exposure to unprotected heights, moving mechanical
> parts, or operation of a motor vehicle; and
> -Can understand, remember, and carry out simple, routine, and
> repetitive tasks involving simple decision-making and average
> (but not fast) production rate, pace, or quotas.  Tr. 20.

6.   The claimant is unable to perform any past relevant work.  Tr. 31.

7.   The claimant was born on January 6, 1967 and was 43 years old, which is
defined as a younger individual age 18-44, on the alleged disability onset
date.  He subsequently changed age category to that of a younger
individual within the age set of 45-49.  Tr. 31-32.

8.   The claimant has a limited education and is able to communicate in
English.  Tr. 32.

9.   Transferability of job skills is not material to the determination of
disability because using the Medical-Vocational Rules as a framework
supports a finding that the claimant is "not disabled," whether or not the
claimant has transferable job skills.  Tr. 32.

10.  Considering the claimant's age, education, work experience, and residual
functional capacity, there are jobs that exist in significant numbers in the
national economy that the claimant can perform.  Tr. 32.

11.  The claimant has not been under a disability, as defined in the Social
Security Act, from May 2, 2012 through the date of this decision.  Tr. 33.

## V. Parties' Arguments

Snow objects to the ALJ's decision on three grounds.  He argues that the ALJ's finding

that he was capable of sedentary work is not supported by the record and criticizes the weight the

ALJ gave to the opinions of Dr. Chaffee, his treating source.  Doc. 14, p. 10-14.  He also argues

that the ALJ's RFC assessment did not fully account for his illiteracy and learning impairments

and that the VE's testimony was not responsive to the RFC because the jobs provided by the VE

were "flawed" and inadequate to address Snow's limitations.  Doc. 14, pp. 14-19.  In response,

the Commissioner submits that substantial evidence supports the ALJ's RFC assessment and that her reliance on the VE's testimony was proper. Doc. 18, pp. 13-19.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when finding that Snow is capable of performing sedentary work

Snow argues that the ALJ erred when finding that he is capable of sedentary work. Doc. 14, p. 10. Specifically, Snow asserts that the ALJ's limitation that he must be able to alternate his position every 45 to 60 minutes as needed but could remain present and on-task at the work station "is not based upon any medical opinion, testimony, or other evidence and is insufficient to address Plaintiff's impairments." Doc. 14, p. 10. Snow provides evidence he believes is contrary to the ALJ's finding—the opinions of his treating physician, Dr. Chaffee, and Snow's own testimony—and criticizes the ALJ's treatment of this evidence. Doc. 14, pp. 10-14.

### 1. Dr. Chaffee's opinions are not entitled to controlling weight

Snow asserts that the ALJ erred because she did not give treating physician Dr. Chaffee's opinions controlling or substantial weight.  Doc. 14, p. 13.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502.  The commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 506 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)). The plaintiff has the burden of showing that a doctor is a treating physician.  *See id.* at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four). Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).

With respect to Dr. Chaffee's opinions, the ALJ found neither of them deserving of great

weight.  Tr. 29.  She stated,

> the claimant's testimony and several other points in the record refers to "Chaffee, M.D."
> or "Dr. Roger" as his doctor, thus offering that he has some patient-physician relationship
> with Dr. Chaffee.  Dr. Chaffee also signed off on the initial set of records from the Open
> M Clinic in November 2012.  This physician appears to be the Medical Director of this
> free clinic based on publically available information.  That having been said, there is no
> evidence that Dr. Chaffee actually examined the claimant or received his presenting
> complaints at any office visit.  No progress notes were authored by him, with all of them
> showing printed names and signatures of other medical doctors—who, likely, come into
> the free treatment facility for periods of time—and nursing staff.  While the claimant's
> testimony obviously imparts that Dr. Chaffee and he do have some treatment relationship,
> likely through the authorization of his ongoing medications, there remains no evidence of
> any actual examination done by this physician per the office notes in the record.  With
> this minimal degree of patient-physician relationship shown, the undersigned cannot give
> any controlling eight to Dr. Chaffee's opinion because it appears to rely on examinations
> done by other physicians.

Tr. 29 (internal citations to the record omitted).  Snow offers no evidence that Dr. Chaffee ever

examined him and does not dispute that the medical records cited by the ALJ contain signatures

of other attending doctors and nurses.  Instead, Snow argues that the evidence the ALJ cited "is

not evidence that Dr. Chaffee was not present during any or all of the examination[s]."  Doc. 14,

p. 13.  This non-responsive argument is without merit.  Snow's failure to identify a treatment

note or other evidence that Dr. Chaffee ever examined him belies his argument that Dr. Chaffee

is his treating physician whose opinion is entitled to controlling weight.  *See Kornecky*, 167 Fed.

App'x at 506.

Pursuant to 20 C.F.R. § 404.1527(c), the Commissioner weighs medical opinion evidence

not entitled to controlling weight based on the following: the examining relationship; the

treatment relationship; the supportability of the opinion; the consistency of the opinion with the

record as a whole; the specialization of the source; and other factors.  As noted above, the ALJ

pointed out the absence of a meaningful documented examining or treating relationship.  The

ALJ also described inconsistencies between Dr. Chaffee's own two opinions and between his

opinions and treatment notes from the Open M Clinic.  The ALJ explained,

> Dr. Chaffee on one form expressed the claimant as being unable to sit, stand, or walk for
> even two hours and needing periods of walking every 20 minutes of work activity; the
> other form reports an ability to do these exertional activities for two hours at a time
> without interruption.  One form mentions the need for a cane to ambulate "sometimes,"
> then stating that device to be medically necessary; the other form not only offers no
> information about the cane but flatly states it to be not required when even occasionally
> engaging in activities while standing or walking.  The Lumbar Spine form opines the
> claimant never being able to crouch or squat, and on SSA's form Dr. Chaffee indicated
> "occasional" ability in these postural positionings.  These represent just a few examples
> of the internal inconsistencies on the two forms completed on the very same day by Dr.
> Chaffee, and this renders them generally unsupported by the record and very
> unpersuasive.

Tr. 29-30.

The ALJ then described how Dr. Chaffee's opinion is unsupported by other evidence in

the record:

> [Dr. Chaffee] posits the claimant being unable to lift and carry even 10 pounds
> occasionally, an exertional ability not consistent with [Snow's] testified ability to do so
> and up to 15-20 pounds.  Dr. Chaffee reported clinical signs of limited range of motion,
> muscle spasm, motor loss, palpable tenderness, muscle weakness, and positive straight-
> leg raise on the left.  Not only are none of these signs seen in any office note from the
> Clinic, they are later shown to be inconsistent with the report that the claimant was
> "unable to" raise either leg for supine or seated straight-leg raise testing—wholly
> inconsistent with the report of positive left leg pain upon this maneuver, and simply not
> shown in that office per the February 2012 office note....Furthermore, Dr. Chaffee reports
> radiating pain and numbness down both legs, which is not consistent with what the
> claimant alleged at the hearing for left-sided symptoms.  There are also a host of
> limitations Dr. Chaffee assessed with respect to the upper extremities (*i.e.*, reaching,
> pushing/pulling, handling, fingering) and environmental intolerances (vibration,
> humidity, wetness, temperature extremes and even moderate noise) that have no
> foundation either demonstrated by the symptoms, signs, and test results in the treatment
> notes or explained.

Tr. 30.

Snow argues that "some" of Dr. Chaffee's answers in his two opinions were inconsistent

because the questions asked were different.  Doc. 14, p. 13.  He asserts that the form entitled

"Ability to do Work Related Activities" asked "how many hours the individual can" sit, stand, and walk "at one time without interruption" (Dr. Chaffee answered 2 hours), and that this is materially different from the question asked on the Lumbar Spine Medical Source Statement: how many minutes or hours can the individual sit and stand at one time *in a competitive work situation* (Dr. Chaffee answered 30 minutes).  Tr. 530; 524-525.   Even if the Court were to credit Snow's dubious distinction between these two questions, Snow cannot account for the blatant contradiction between Dr. Chaffee's two reports regarding Snow's alleged cane use nor explain how Dr. Chaffee arrived at his unexplained and unsupported upper body restrictions and inconsistent postural limitations.[5]  The ALJ properly considered the evidence when weighing Dr. Chaffee's opinion.  *See* 20 C.F.R. § 404.1527(c) (medical evidence weighed by the supportability and consistency of the opinion).

The ALJ also considered Dr. Chaffee's opinions in light of the other evidence in the record, as 20 C.F.R. § 404.1527(c) instructs.  *See* Tr. 30 ("[Dr. Chaffee's] opinion has been given little weight because it is without any support from the other evidence of record, particularly Dr. Squier's complete physical examination;" Dr. Chaffee's opinions appear to be based on Snow's "subjective report of symptoms and limitations").  Additionally, as discussed below, the ALJ did not err in finding that Dr. Chaffee's opinions were not supported by Snow's testimony, as Snow alleges.

### 2.  The ALJ properly considered Snow's testimony

Snow asserts, "the ALJ's RFC finding is contrary to Plaintiff's testimony" and the medical opinions.  Doc. 14, p. 10.  He states,

> Plaintiff's testimony consistently states that he is only able to help with very limited
> chores like folding towels and making quick meals before needing to rest, and that he

---

[5]  For example, both forms asked the identical question regarding postural limitations, "how often can your patient perform the following activities?" (Tr. 526, Tr. 532 (substituting "the individual" for "your patient")).

cannot sit for very long without using his hands to support him. (R.63, 69). Plaintiff has testified that he is unable to concentrate for very long on a single task, which is supported by a diagnosis of ADD. (R.72, 512). Furthermore, Plaintiff has testified that he is only able to sleep about twenty minutes out of every hour during the night because he is only able to sleep on one side due to pain. (R.60). This lack of sleep causes him to require lots of naps during the day of about thirty minutes time each. (R.69). This testimony indicates that he would be unable to perform even sedentary work on a regular and continuing basis.

Doc. 14, p. 10.

The ALJ's decision must be affirmed if it is supported by substantial evidence.  *See*

*Wright*, 321 F.3d at 614 (courts defer to the agency's decision if it is supported by substantial

evidence even if substantial evidence in the record would also support an opposite conclusion.).

Here, the ALJ considered Snow's testimony but found him not entirely credible.  Tr. 24.  She

explained that, in terms of general credibility, Snow erroneously testified that he was

hospitalized for "months" after his back surgery; yet he was hospitalized for only one month—

from May 9, 2010 to June 2, 2010.  Tr. 27.  He had not been forthcoming about his past

polysubstance abuse.  Tr. 27 (citing his IV use of Oxycontin just prior to his hospitalization). The

ALJ observed that Snow's allegations of pain were not borne out by treatment notes that

consistently showed no evidence of disabling pain.  Tr. 25 (citing Dr. Squier's exam showing

normal range of motion, muscle strength, and general presentation; no pain while performing

maneuvers during exam such as walking and leg raising; and noting that some visits to the Open

M Clinic were for unrelated health reasons and that generally Snow reported he was doing well).

The ALJ also commented that there was little support in the record for Snow's contention that

his back pain increased markedly with relatively short durations of sitting, standing and walking

instead of other factors Snow described, such as that his back and buttock pain was triggered by

"sleeping on concrete" and that Snow sleeping on his wife's couch for eight months.  Tr. 25, 63,

505.  The ALJ remarked that Snow's pain medication has been routine and conservative

throughout the entire period at issue, cutting against Snow's complaints that medication has been ineffective in treating his pain.  Tr. 25-26 (describing his consistent prescriptions for Tramadol and Neurontin and that most of his visits to the Open M Clinic were for routine medication refills). The ALJ noted that Snow was not prescribed a cane; bought one himself; and yet did not have it with him at the hearing.  Tr. 26.  She also pointed out that he was never referred for additional treatment or sent for follow-up spine imaging, further indicating his pain was not as disabling as alleged.  Tr. 26.  The ALJ also considered Snow's daily activities and found that they support a finding that he is able to perform sedentary work with an opportunity to change position every 45-60 minutes.  Tr. 25.  In sum, the ALJ thoroughly considered Snow's testimony but found him not entirely credible and his allegations unsupported by the medical evidence.  *See* 20 C.F.R. § 404.1529(c)(2)(an ALJ considers objective medical evidence in determining the intensity and persistence of symptoms).

Snow argues that the ALJ erred because she described Snow's testimony that he can sit and put model cars together yet ignored Snow's later clarification that he no longer puts models together because he is unable to sit and use his hands.  Doc. 14, p. 11.  Snow also asserts that the ALJ ignored the fact that he testified that he could perform household chores "but for his back pain."  Doc. 14, p. 11.  Snow did not testify at the hearing that he does not perform household chores "but for his back pain"; that assertion was reported by Snow during his examination with Dr. Bard and the ALJ so noted.  Tr. 25 (commenting that Snow told Dr. Bard that he could perform "normal" household chores except that he has to take rests because of his back pain). Instead, the transcript shows he testified that his daily activities include walking outside, stretching, letting the dogs out, making coffee, watching TV, reading a book, folding towels and his bed linens, putting laundry in the washer after his wife carries the basket downstairs,

preparing light meals, drying dishes and putting them away, talking on the phone, riding in and driving a car, and going to church.  Tr. 60-64, 68.  The ALJ also noted Snow's function report in which he stated that he buys food at the store and his statements to Dr. Bard that he does laundry at a laundromat, spends time with friends and his brother, and can do basic yard work and car repair.  Tr. 25.  *See* 20 C.F.R. § 404.1529(c)(3)(i)(the ALJ considers a claimant's activities of daily living when determining the intensity of alleged impairments). Regardless of whether Snow currently puts model cars together, other evidence cited by the ALJ supports her findings.

Snow argues that the ALJ erred because she ignored that Tramadol "is considered a 'narcotic-like pain reliever'" used to treat moderate to severe pain and she ignored Snow's reported side effects of Gabapentin.  Doc. 14, p. 12.  First, the ALJ accurately pointed out that Snow's medication remained unchanged, no other treatment was recommended, Snow often reported during visits at the Open M Clinic that he was doing well, and specifically reported to Dr. Squier that his back pain improved with medication.  Tr. 26, 480.  Next, the ALJ did not ignore Snow's reported side effects of Gabapentin; she specifically referred to Snow's testimony regarding side effects but noted that the dizzy and drunken feeling he reported was counteracted by taking this medication at night, which Snow did.  Tr. 26.  She pointed out that Snow was, therefore, managing during the day on his Tramadol alone.  Tr. 26.  She also commented that Snow never reported side effects of his medication to doctors at the Open M Clinic, at any office visit accepting refills, or to Dr. Squier.  Tr. 26.

Finally, Snow argues that he testified that he does not want stronger pain medication because he does not want to become addicted.  Doc. 14, p. 12.  He asserts that this explanation "should actually support his credibility."  Doc. 14, p. 12.  Snow's opinion of his credibility does not render the ALJ's credibility finding erroneous.  As discussed, the ALJ's treatment of Snow's

testimony is explained and supported by the evidence and must not be disturbed.  *See Garner,
745 F.2d at 387*; *Wright*, 321 F.3d at 614.

### B.  The ALJ did not fail to account for Snow's mental impairments

Snow argues that the ALJ did not fully account for his illiteracy and learning impairment.

Doc. 14, p. 14.  He points out that the regulations define illiteracy as the "inability to read or

write," 20 C.F.R. § 404.1564(b)(1), and that a person who reads below a third grade reading

level is "functionally illiterate."  Doc. 14, p. 14 (citing *Williams v. Astrue*, 2012 WL892544, at

*9 (N.D.Ohio Mar. 14, 2012)).  He criticizes the ALJ's finding that he is not illiterate and argues

that the ALJ misconstrued the evidence in reaching her determination.

The ALJ addressed the argument made at the hearing by Snow's attorney that he is

"essentially illiterate."  Tr. 27.  The ALJ noted that documentation supports his limited progress

in school, a learning disability, and current difficulty with reading and writing.  Tr. 27.  She

noted that, prior to leaving school during tenth grade, Snow was deemed to be reading between

the third and fourth grade level.  Tr. 27.  She also commented that Dr. Bard described Snow's

vocabulary as "substandard."  Tr. 27.  She explained that Snow's allegation of "near total

inability to read" is inconsistent with other statements made by Snow, such as his

communication to the administration that he "can read some but not well" and "can write but

with spelling errors."  Tr. 27.  She referenced his function report, which Snow admitted he

completed with the help of his wife; the ALJ observed that, while several words were misspelled,

Snow's "responses conveyed much greater ability to write, spell basic words, and understand

basic content of written material than alleged."  Tr. 27.  The ALJ also noted that Snow testified

that he read a book from 1884 on home remedies to help resolve a toothache he suffered from.

Tr. 27.  The ALJ commented that the information Snow provided is inconsistent regarding the

severity of his problems and that the evidence does not support a finding that he is illiterate.  Tr. 27.

Snow's argument that he is "functionally illiterate" based on the standard in *Williams* is without merit; he does not point to evidence that he reads below a third grade level and records indicate that, at thirteen years old, he was reading at between a third and fourth grade level.[6]  *See* Tr. 251.  Snow asserts that the ALJ ignored that he filled out the function report with the help of his wife and that he testified that he did not understand the home remedy book.  Doc. 19, p. 4.  However, the ALJ noted Snow's wife helped him fill out the function report; she further specified that he wrote it by hand himself and that, although his spelling was poor, his answers were legible.  Tr. 27.  Moreover, although Snow testified that he did not understand the home remedy book, he explained that he consulted the book because it was about how people cooked food "back then and how they dealt with pain and daily cleaning stuff."  Tr. 61.  He explained that he was looking for a remedy for his toothache and he wanted to see what kind of remedy people used then.  Tr. 62.  He stated that he did not understand what the book meant when he read it and that he gave it to his wife when she got home but that "she didn't even read it because they was talking about dipping ammonia into—a cotton  in—with some ammonia and stuffing it in there.  And I was like that don't seem to be cool."  Tr. 62.  Snow's assertion—that he did not understand the book and "tried to get his wife to read it for him" (Doc. 14, p. 16)—does not accurately characterize Snow's recitation at the hearing during which he was able to explain to the ALJ that he understood the subject matter of the book; consulted it to find a remedy for his toothache; professed to not understand the book yet described to the ALJ the remedy involving

---

[6]  In *Williams*, the claimant testified that "he cannot read or write even the most rudimentary message" and tested at the first grade reading level.  2012 WL892544, at *9.  The court found that the ALJ erred because she disregarded the claimant's assertion of illiteracy based upon the claimant's testimony that he thought he completed ninth or tenth grade.  2012 WL892544, at *9.

ammonia and cotton despite also stating that, though he tried to get his wife to read the book, she did not read it.  Tr. 61-62.  Snow has not shown, therefore, that the ALJ improperly relied upon his testimony regarding the home remedy book.

Snow also complains that the ALJ discounted Dr. Squier's conclusions regarding Snow's "apparent intellect and functioning level."  Doc. 14, p. 14.  Snow saw Dr. Squier for a physical consultative exam.  Tr. 480-483.  At the end of his report, Dr. Squier wrote, "given his low education level as well as his inability to read or write, I do not feel as though [Snow] would be able to work in a sedentary job as it would be difficult for him to find any type of meaningful work with a low education level and the inability to read or write."  Tr. 483.  The ALJ considered Dr. Squier's statement but gave it no weight, explaining that Dr. Squier is a medical doctor with "no professional expertise in the areas of psychoeducational abilities" or vocational factors; the statement expresses concern that Snow would have difficulty *finding* a job, but a perceived likelihood of success in finding a job is not a factor considered in the five-step social security evaluation process; and Dr. Squier's statement was based on information reported by Snow and is, therefore, unsupported by the record and contrary to the ALJ's credibility finding described above.  Tr. 28.  *See* 20 C.F.R. § 404.1527(c)(5) (more weight is generally given to an opinion of a specialist on a medical issue related to his or her area of expertise than a specialist who is not); § 404.1527(c)(3) (the ALJ considers the supportability of a medical opinion).

Next, Snow argues that Defendant's assertion that the ALJ relied on Dr. Bard's opinion that Snow can perform simple tasks is "faulty" because Dr. Bard, a psychologist, is not a vocational expert.  Doc. 19, p. 6.  The ALJ properly relied on Dr. Bard's opinion, as well as the opinions of the state agency reviewing psychologists, all of whom found that Snow had borderline intellectual functioning but nevertheless retained the ability to perform tasks with

simple, one- to two-step instructions. Tr. 28, 92, 117, 478.  *See* 20 C.F.R. § 404.1527(e)(2)(i)

("agency medical and psychological consultants and other program ... psychologists ... are highly

qualified" and "experts in Social Security disability evaluation.").  Lastly, Snow identifies

evidence in the record that he believes supports his contention that he is illiterate.  Docs. 14, p.

16; 19, p. 5.  As noted, such evidence does not permit reversal of the ALJ's decision so long as

substantial evidence in the record supports the ALJ's decision.  *See Wright*, 321 F.3d at 614.

Substantial evidence in the record supports the ALJ's decision and it must, therefore, be

affirmed. *Id*.

### C.  The ALJ properly relied on the VE's testimony

Snow argues that, in response to the ALJ's hypothetical question, the VE provided three

jobs that are "flawed."  Doc. 15, p. 17.  He criticizes the Dictionary of Occupational Titles

(DOT) upon which the VE relied.  Doc. 14, p. 17.  The regulations make plain, however, that the

Social Security Administration relies upon the DOT.  *See* 20 C.F.R. § 404.1566(d)(1); *Hauser v.

Comm'r of Soc. Sec.*, 2014 WL 48554, at *12 (S.D.Ohio Jan. 7, 2014)(although plans are

underway to replace the DOT as the agency's primary vocational reference, the DOT remains the

operative reference material); *Cunningham v. Astrue*, 360 Fed. App'x 606, 615 (6th Cir. 2010);

SSR 00-4p, 2000 WL 1898704, at *2.

Next, Snow asserts that the VE's testimony was inconsistent with O*NET, the "latest

Department of Labor occupational information."  Doc. 14, p. 17.  As noted, there is no

requirement that the VE's testimony be consistent with O*NET.  20 C.F.R. § 404.1566(d)(1);

*Hauser*, 2014 WL 48554, at *12.  Moreover, at the hearing, Snow's counsel did not object to the

VE's qualifications when asked and did not object to the VE's numbers or stated reference

materials.  *See* Tr. 75-82.  The ALJ asked the VE if her "testimony is consistent with the DOT,

as well as supplemented by your experience and training as a vocational expert" and the VE

answered yes.  Tr. 79.  Snow cannot now argue that the ALJ erred because she relied on VE

testimony that in turn relied on, but was allegedly incompatible with, the DOT.  *Martin v.*

*Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 374 (6th Cir. 2006) (claimant's attorney did not object

to the VE's testimony that there was no conflict between the DOT and the SVP for a specific job;

the ALJ specifically asked the VE if there was a conflict and the VE answered no, and there is no

affirmative duty placed on an ALJ to independently investigate the VE's answers).

Snow asserts that the VE testified that the job of small products assembler "requires a

reasoning level of 2, meaning that this job would require the ability to understand and carry out

detailed but uninvolved written and oral instructions," and that the evidence shows that Snow

cannot operate at this level.  Doc. 14, p. 17.  However, the VE did *not* testify that the job of small

products assembler requires a "reasoning level of 2"; instead, the VE testified that the job

required an SVP of 2, which refers to the amount of time it takes a typical worker to learn a job.

Tr. 77; *see* SSR 00-4p, 2000 WL 1898704, at *3.  The VE also testified that the language level of

small products assembler is first to third grade.  Tr. 77.  Although Snow asserts that the DOT

definition of small products assembler indicates a reasoning level of 2, the VE was not asked

about, nor did she testify to, the reasoning level; the VE stated that her answers were consistent

with the DOT; and Snow's attorney did not object or question the VE with respect to the

reasoning level of a small products assembler.  *See Martin*, 170 Fed. App'x at 374.  Moreover,

"there is no precedent that requires the Commissioner to align DOT 'reasoning levels' with RFC

classifications."  *Monateri v. Comm'r of Soc. Sec.*, 436 Fed. App'x 434, 446 (6th Cir. 2011);

*Rienzi v. Colvin*, 2013 WL5279350, at *10 (N.D.Ohio 2013).  Accordingly, Snow's argument,

and his similar arguments with respect to the other two jobs provided by the VE (Doc. 14, p. 18),
are without merit.[7]

Finally, Snow's assertion that the VE did not explain why she departed from the DOT
guidelines in testifying that the job of small products assembler exists as sedentary as well as
light work (Doc. 19, p. 8) is not persuasive; the VE explained that her answer was based on the
census code classification, a reliable publication, and her experience and training as a vocational
expert.  Tr. 77, 79; *see* 20 C.F.R. § 404.1566(d) (in considering whether jobs exist in the
economy, the agency takes administrative notice of census reports published by the Bureau of
the Census); SSR 00-4p, 2000 WL 1898704, at *2 (the ALJ may rely on VE information
different from the DOT when that information is based on another reliable publication or the
VE's own experience). Here, the ALJ explained that the VE's testimony with respect to light and
sedentary work was not consistent with the DOT, but that the VE provided a reasonable
explanation for the variation (Tr. 33).  *See id.* at *4 (when there is a conflict between VE
testimony and the DOT, the ALJ must explain in her decision how she resolved the conflict). In
sum, the ALJ did not err when she relied on the VE's testimony.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: July 24, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[7]  Snow argues for the first time in his reply brief that the ALJ's hypothetical to the VE did not accurately portray his
limitations.  Doc. 19, p. 7.  The Court declines to consider Snow's new argument.  *See Scottsdale Ins. Co. v.
Flowers,* 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are deemed waived and
need not be considered by the court).